FILED

2005 Jan-12  AM 10:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **NANCY WATWOOD**, as | ) | |
| Administratrix of the Estate of | ) | |
| Roy Randall Watwood, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: **CV-04-PT-486-M** |
| | ) | |
| **CSX TRANSPORTATION, INC.,** | ) | |
| a corporation; **NORMAN W.** | ) | |
| **LATTIMORE**, an individual; **et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants CSX Transportation, Inc.'s and

Norman Lattimore's Motion for Summary Judgment filed on October 27, 2004.

## FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Nancy Watwood is a citizen of Alabama, residing in Etowah County, and is the

administratrix of the estate of Roy Randall Watwood ("Watwood").  Defendant CSX

Transportation, Inc. ("CSX") is a Virginia corporation with its principal place of business in

Florida.  Defendant Norman W. Lattimore ("Lattimore") is a citizen of Georgia, residing in

Columbus.

This cause of action arises from an accident, occurring on July 5, 2003, in which a train

operated by CSX and engineered by Lattimore struck a log-hauling tractor-trailer driven by

---

[1] The court notes where "facts" appear disputed.

1

Watwood at a railroad crossing.  Watwood died in the accident.

According to the Complaint, Watwood, who was employed by D&A Trucking, was traveling north on County Road 235 on the day of the accident.  (Cmpt. ¶ 9).  When he approached railroad crossing 639-397G, he allegedly found that the crossing gates had malfunctioned and were stuck in the down position blocking traffic from each direction.  (*Id.*)  Prior to July 5, 2003, Steve Timber, the company for which Watwood was transporting logs, had been operating in the general area of the accident for approximately two and a half months.  (James Aff. ¶ 5).  Chris James,[2] an employee of Steve Timber, testified that during this time a crossing in the area falsely activated at least three times per week.[3]  (*Id.*)  According to James, on several occasions he had sent other employees to hold the crossing gates up during such false activations so that timber trucks could cross the tracks.  (*Id.* at ¶ 3).  James testified that, on one occasion, CSX employees who were working at the crossing helped Steve Timber employees hold up the gates for a passing truck.  (*Id.* at ¶ 6).  Bob Deweese, who also worked for Steve Timber at the time of the accident, testified that he had spoken with approximately ten co-

---

[2] Defendants move to strike the entire purported affidavit of James.  Defendants note that, at the time of filing, this document was unsigned and unsworn.  Therefore, they argue, the document is not an affidavit and should be stricken.  After defendant's Motion to Strike this affidavit, plaintiff filed a signed and notarized copy.

[3] Supposedly, James is referencing crossing 639-397G in the testimony concerning the false activations of the crossing's safety devices.  However, the affidavit does not specifically give the location or identity of the crossing.

Defendants argue that the fact that the gates were down is not necessarily evidence of a false activation at crossing 639-397G.  They further maintain that there is no evidence that negligent maintenance caused any such false activation.  Defendants also assert that there is nothing in the James or Deweese affidavits that indicates they are competent to opine on whether an activation is false, as defined by the Federal Railroad Administration.

2

workers who stated that they had problems with the signals malfunctioning at the crossing.[4]
(Deweese Aff. ¶ 3).  Deweese stated that on one occasion he sat in a truck at the crossing for
approximately thirty minutes while the signals were falsely activated.  (*Id.* at ¶ 4).  Finally,
Deweese asserted, a railroad worker who had been working on the track came over and held up
one of the gate arms to allow Deweese to drive under it.[5]  (*Id.*)  Deweese testified that on another
occasion he sat at the crossing for approximately one hour while the signals malfunctioned.  (*Id.*

---

[4] Defendants move to strike this statement by Deweese as inadmissible hearsay under
Federal Rules of Evidence 801(c) and 803.  Defendants note that Federal Rule of Civil Procedure
56(e) requires that affidavits in opposition to summary judgment motions "be made on personal
knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show
affirmatively that the affiant is competent to testify to the matters stated therein."  *See Macuba v.
Deboer,* 193 F.3d 1316, 1322 (11th Cir. 1999) (stating "[t]he general rule is that inadmissible
hearsay 'cannot be considered on a motion for summary judgment'").  *See also Thomas v.
Alabama Council on Human Relations, Inc.,* 248 F.Supp.2d 1105, 1112 (M.D. Ala. 2003)
(stating, "[a]ffidavits which fail to meet the standards set forth in Rule 56(e) may be subject to a
motion to strike"); *Wyant v. Burlington Northern Santa Fe R.R.,* 210 F.Supp.2d 1263, 1272
(N.D. Ala. 2002) (stating, "[i]f a supporting or opposing affidavit fails to conform to Rule 56(e),
the opposing party may move to strike the nonconforming portion or portions").  Defendants also
assert that this statement makes an improper conclusion: that the signal malfunctioned.
Defendants maintain that such conclusory statements are improper under Rule 56.  *See Thomas*,
248 F.Supp.2d at 1112 (stating, "[t]he requirements of Rule 56 make it plain that affidavits
which set forth conclusory arguments rather than statements of fact based on personal knowledge
are improper").

[5] Deweese also testified as follows:

> I have never personally spoke (*sic*) with anyone at CSX regarding the signal
> malfunction but believe from witnesses (*sic*) the workers on the machines that
> they knew about the signal malfunctioning.

(Deweese Aff. ¶ 6).  Defendants argue that this portion of Deweese's affidavit is due to be
stricken because it is not based upon personal knowledge.  *See Wyant,* 210 F. Supp. 2d at 1273
(stating, "[l]ikewise, an affidavit stating only that the affiant 'believes' a certain fact exists is
insufficient to defeat summary judgment by creating a genuine issue of fact about the existence
of that certain fact").  The court disagrees.  Deweese can express an opinion pursuant to Rule of
Evidence 701 based on observing CSX employees.

3

at ¶ 5).

According to the Complaint, after finding crossing 639-397G blocked by the false activation of the traffic control devices, Watwood turned his truck around and went north on County Road 190 to cross the railroad tracks at the next crossing down, crossing 639-400M. (Cmpt. ¶ 10).[6]  The accident occurred at this alternate crossing, which is located in Alpine, Alabama (Talladega County).

Lattimore and James Brian Dyer ("Dyer"), the conductor on the train, testified that on the day of the accident, the train was heading from Manchester, Georgia to Birmingham, Alabama. (Lattimore Aff. ¶ 2; Dyer Aff. ¶ 2).  According to Dyer, the weather was good, the sun was out, and it was not raining.  (Dyer Aff. ¶ 5).  At around 1:00 p.m. that day, the train was approaching

---

[6] The James affidavit states as follows:

> On the date of the accident Roy Watwood, deceased, radioed to me that the train guards were down on the tracks and that he could not go through the intersection. I told him to wait a minute and I would get another truck to go down and hold the rails up for him so he could go through the intersection.  I had done that several times since we had been working in that area.

> Roy Watwood radioed back to me that a woman told him how to get around that intersection.  The woman told him to back up in the store parking lot and that he need (*sic*) to go down the road and take a right it would (*sic*) take him across the railroad tracks.

(James Aff. ¶¶ 3 - 4).  Defendants claim that these statements regarding what Watwood and the unidentified woman said are inadmissible hearsay and should be stricken.  Defendants argue that the fact that Watwood is deceased does not create an exception to the rule of exclusion for the statements attributed to him.  *See Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1255 (11th Cir. 1999) (stating that hearsay testimony does not become admissible simply because the declarant is dead).  Further, defendants argue, James' affidavit does not even identify with any particularity or specificity the railroad crossing at issue.  See, however Federal Rule of Evidence 803(1) and (3).  Note that Watwood voluntarily elected to take an alternative to James' suggestion.

crossing 639-400M.

Clay McBrien ("McBrien"), a professional engineer with the Alabama Department of Transportation ("ALDOT"), testified that crossing 639-400M is immediately east of the Coosa River, where County Road 190 crosses over the railroad track owned by CSX near milepost ANJ-926. (McBrien Aff. ¶ 5). According to McBrien, crossing 639-400M has passive traffic control devices, including advance warning signs, no passing zone signs, and railroad crossing pavement legends and markings. (McBrien Aff. ¶ 5). The State of Alabama Highway Department authorized these warning devices at this crossing in 1978. (McBrien Aff. ¶ 6). Pursuant to this authorization, the ALDOT hired a contractor to install the warning devices. (*Id.*) The installation was paid for with funds provided by the federal government. (*Id.*)

At the time the train approached crossing 639-400M on July 5, 2003, it was traveling southwest (Dyer Aff. ¶ 5) at 48 miles per hour (Lattimore Aff. ¶ 3; Dyer Aff. ¶ 3). More than one-quarter of a mile before the crossing, Lattimore sounded the locomotive's horn. (Lattimore Aff. ¶ 4; Dyer Aff. ¶ 4). Lattimore continued to sound the horn intermittently until the collision. (Lattimore Aff. ¶ 5; Dyer Aff. ¶ 5; Spriggs Aff. ¶ 3). At the time, the locomotive's headlights were burning, its ditch lights were operating, and its bell was ringing continuously. (Lattimore Aff. ¶ 4; Dyer Aff. ¶ 4). Both Lattimore and Dyer observed the logging truck as it approached the crossing. (Lattimore Aff. ¶ 5; Dyer Aff. ¶ 5). They testified that they had a clear view of the truck, and that there were no trees or vegetation to obstruct their view. (*Id.*) They further testified that it appeared to them that the driver of the truck also had an unobstructed view of the train. (*Id.*) The truck was traveling northwest, from the locomotive's left to its right. (*Id.*)

Both Lattimore and Dyer testified that the truck was traveling at a sufficiently slow speed

such that they expected it to stop at the crossing. (Lattimore Aff. ¶ 5; Dyer Aff. ¶ 5). According to Dyer, the truck proceeded through the crossing, even though the locomotive's horn was blowing and the train was plainly visible. (Dyer Aff. ¶ 5). After the truck proceeded through the crossing, Lattimore applied the emergency brakes of the train. (Lattimore Aff. ¶ 5; Dyer Aff. ¶ 5). However, the train still collided with the truck. (*Id.*)

James testified that, shortly after the accident, he went to the scene and spoke with one of the trainmen from the locomotive that collided with Watwood. (James Aff. ¶ 8). According to James, the trainman told him that he had witnessed Watwood easing up to the crossing and stopping repeatedly prior to the collision.[7] (*Id.*)

---

[7] Plaintiff maintains that this portion of James' testimony is not hearsay because the statement by the trainman qualifies as a statement against interest. Defendants contend that the statements of the unidentified trainman are inadmissible hearsay. According to defendants, these statements cannot be put into admissible form at trial because none of the exceptions enumerated in Federal Rule of Evidence 801(d)(2), covering admissions by party-opponents, is satisfied. *See generally Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999) (indicating that a trial court may consider hearsay statements in an affidavit only if they can be reduced to admissible form at trial); *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir. 1996) (acknowledging that otherwise admissible evidence may be submitted in inadmissible form at the summary judgement stage if it can be submitted in admissible form at trial). Defendants maintain that there is insufficient evidence in the affidavit to make a determination as to the identity of the trainman or his employer or whether his statements were concerning a matter within the scope of his agency or employment. Defendants argue that the purported agency of the trainman cannot be established by means of the hearsay statement being offered. *See* 29A Am. Jur. 2d Evidence § 816 (stating, "a statement offered under the rule of evidence governing statements arising out of agency or employment cannot itself establish the existence or scope of agency necessary for admission of the statement"). *See also Int'l Telecomm. Exchange Corp. v. MCI Telecomm. Corp.,* 892 F. Supp. 1520, 1544 (N.D. Ga. 1995) (stating that opponent of motion for summary judgment cannot use Federal Rule of Evidence 801(d)(2)(C) or (D) when hearsay statement of movant's alleged employee was not a sufficient basis to establish that person was in fact movant's employee). Defendants assert that the hearsay statements of the unidentified trainman are due to be stricken because it is not possible to determine whether the hearsay exception applies such that the statements of the trainman could be offered in admissible form at trial. *See Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that plaintiff's statements in her deposition which were based upon the hearsay statements of unknown co-workers could not

William Jeff Spriggs, Jr. ("Spriggs"), a road foreman of engines for CSX, testified that, after the accident, he downloaded information from the lead locomotive's event recorder. (Spriggs Aff. ¶ 3).  According to Spriggs, the Federal Railroad Administration ("FRA") requires that an event recorder, which is an electronic computer device, be placed on all locomotives.  (*Id.* at ¶ 2).  Event recorders record data relevant to the locomotive's speed, brake pressure, distance, horn, and bell.  (*Id.*)  Spriggs testified that the event recorder involved in this case showed the following information about the train: (1) at the moment of the application of the locomotive's emergency brakes, the locomotive engine was traveling at 48 miles per hour;[8] (2) thereafter, its speed dropped; (3) for at least one mile prior to the application of the emergency brakes, the locomotive was traveling between 46 and 48 miles per hour; (4) for approximately one quarter of a mile before emergency application of the brakes, the locomotive's horn was sounding intermittently; and (5) subsequent to the application of the emergency brakes, the locomotive continued to sound its horn intermittently for over 1200 feet.  (*Id.* at ¶ 3).

Plaintiff Nancy Watwood filed this action as administratrix of the estate of Roy Watwood on February 3, 2004 against CSX and Lattimore in the Circuit Court of Etowah County, Alabama.[9]  Defendants CSX and Lattimore removed the action to this court on March 10, 2004

---

be used to defeat a motion for summary judgment).  *See also Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1566 (11th Cir. 1991) (finding that statement of cabin steward on cruise line did not concern a matter within the scope of his agency or employment and was, therefore, hearsay).

[8] The FRA imposes a maximum speed of 60 m.p.h. for such trains.  (Spriggs Aff. ¶ 4; Lattimore Aff. ¶ 3; Dyer Aff. ¶ 3).

[9] The Complaint alleges, in part, the following:

The Plaintiff avers that Defendant CSX Transportation, Inc. negligently and/or

on the basis of diversity jurisdiction.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-

---

wantonly failed to properly maintain, inspect and repair the gates and lights guarding crossing number 639397G. Said negligence proximately resulted in the wrongful death of Mr. Roy Randall Watwood.

The Plaintiff avers that the Defendant CSX Transportation, Inc. negligently failed to properly cut back the vegetation as to allow proper site (*sic*) line from the stop line approaching the subject crossing. Said negligence proximately resulted in the wrongful death of Mr. Roy Randall Watwood.

The Plaintiff avers that Defendants, CSX and Norman W. Latimore (*sic*), had knowledge that the gates and lights guarding Crossing Number 639397G were malfunctioning and negligently failed to take proper steps to properly warn users of the unguarded Crossing Number 63400M as to the approaching train.

The Plaintiff avers that the Defendant, Norman Latimore (*sic*), negligently operated said train in that the Defendant failed to keep a proper lookout and/or traveled at an improper speed in light of the malfunctioning crossing mechanisms at Crossing Number 639397G.

moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I.   Defendant's Motion.

According to defendants, plaintiff asserts that they were negligent or wanton in four ways: (1) that Lattimore operated the train at an improper speed and failed to keep a proper lookout; (2) that because the gates at crossing number 639-397G were allegedly malfunctioning defendants had a duty to warn users of crossing 634-400M of an approaching train; (3) that defendants failed to cut back vegetation so as to give motorists a proper line of sight; and (4) that defendants failed to maintain, inspect, and repair the active warning devices at crossing number 639-397G. Defendants maintain that they are entitled to summary judgment on all of these

claims.

**A.     Contributory Negligence.**

Under Alabama law, contributory negligence, as an affirmative defense, completely bars a plaintiff's claim of liability for a defendant's negligence. *Tombrello v. Copeland,* 497 So.2d 1124, 1126 (Ala. 1986). A plaintiff is contributorily negligent if he: (1) has knowledge of the dangerous condition; (2) has an appreciation of the danger under the surrounding circumstances; and (3) fails to exercise reasonable care, by placing himself in the way of danger. *Ridgeway v. CSX Transp., Inc.,* 723 So.2d 600, 606 (Ala. 1998). According to defendants, a defendant can meet its burden of proving these three elements by demonstrating that the plaintiff violated a statute designed to prevent the harm that occurred. *See Ridgeway,* 723 So.2d at 607 (holding motorist contributorily negligent as a matter of law for violating Alabama Code § 32-5A-150). Section 32-5A-150(a) of the Alabama Code states:

> Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within 50 feet but not less than 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely. The foregoing requirements shall apply when:
>
> (1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
> (2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
> (3) A railroad train approaching within approximately 1,500 feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
> (4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

Ala. Code § 32-5A-150(a) (1975). Defendants maintain that Watwood violated this statute.

Defendants argue that CSX's train was blowing its horn within 1500 feet of the grade

crossing.  Further, CSX's train was, according to defendants, plainly visible and in hazardous

proximity to the crossing.  Finally, defendants point out that Roy Watwood failed to yield to the

train and instead proceeded through the crossing, directly in the train's path.  According to

defendants, these facts dictate a finding of contributory negligence as a matter of law.

Defendants point to the following passage from *Ridgeway*:

> [I]t remains the law in this state that when a motorist, in violation of § 32-5A-150, fails to stop, look, and listen before crossing a railroad track and that failure results in injury or death caused by a collision with a passing train, the motorist is guilty of contributory negligence as a matter of law, unless special circumstances existing at the crossing suggest that even by keeping a proper lookout he could not have been aware of the presence of the railroad crossing or of the danger presented by that crossing.

*Ridgeway*, 723 So.2d at 607.  Defendants argue that there is no evidence to support a finding of

any special circumstances to obviate the impact of Watwood's violation of § 32-5A-150.  They

assert that Watwood knew or should have known of the crossing because it was plainly visible

and its presence was well indicated by advance warning signs and crossbucks.  As evidence of

these propositions, defendants have submitted several photographs of the railroad crossing.  (Def.

Exh. 5).[10]  Additionally, defendants contend that Watwood knew or should have known of the

approaching train.  In support of their position, defendants point to the evidence that the people

in the two vehicles could easily see each other, there was no vegetation or other obstruction to

obscure Watwood's view of the train, and the locomotive's horn was blowing, its headlight was

burning, and its ditch lights were operating.  Given this evidence, defendants conclude that

Watwood was contributorily negligent as a matter of law because he violated § 32-5A-150.

---

[10] At oral argument the court requested additional photographs.  The defendant supplied additional ones – marked as Exhibit A.

11

According to defendants, in addition to violating § 32-5A-150, Watwood was also negligent as a matter of common law.  Defendants argue that, under Alabama law, a motorist has a duty to stop, look, and listen prior to proceeding over a grade crossing.  Defendants highlight the following quote from *Atlantic Coast Line R. Co. v. Griffith*, 113 So.2d 788 (Ala. App. 1959):

> It is established by our decisions that one who is about to cross a railroad track must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. The law thus imposes a continuing duty to see that the way is clear before attempting to cross.  Where obstructions interfere with his view of the track, it is all the more his duty to stop, look, and listen at a point where he can best see and hear, and, seeing or hearing, avoid an onrushing train.

113 So.2d at 792 (internal quotation marks and citations omitted).  Defendants maintain that a person who fails to stop, look, and listen in such a situation is contributorily negligent as a matter of law.  In *Callaway v. Adams*, 40 So.2d 73 (Ala. 1949), the Supreme Court of Alabama stated regarding this duty:

> The doctrine is rested on the duty of the traveler to keep a continuous lookout as he approaches a railroad crossing until he can see that no train is dangerously near. So, when the undisputed facts disclose that by a proper lookout he could not fail to see the train, he cannot acquit himself of contributory negligence by saying he looked and did not see it.

40 So.2d at 77.

Defendants contend that they have met their burden by showing that Watwood knew or should have known of the existence of the crossing, that he should have understood and appreciated the danger posed by the crossing, and that he nevertheless failed to exercise reasonable care.  According to defendants, the accident would never have occurred if Watwood had come to a full and complete stop at the crossing and waited for the train to pass, or even if he

had looked and listened sufficiently to note the noise and appearance of the approaching train.

Defendants further assert that Watwood did not yield to the right-of-way of the train as required

by law, and his failure to do so was a proximate cause of the accident.  *See National R.R.*

*Passenger Corp. v. H & P, Inc.*, 949 F. Supp. 1556, 1567-68 (M.D. Ala. 1996) (finding

motorist's failure to yield right-of-way to oncoming train was proximate cause of accident).

Under these circumstances, defendants conclude, it is entirely appropriate to grant summary

judgment.  *See Ridgeway*, 723 So.2d at 608 (affirming grant of summary judgment on grounds of

contributory negligence); *Baker v. CSX Transp., Inc.*, 46 F. Supp. 2d 1230, 1233 (M.D. Ala.

1999) (granting summary judgment on grounds of contributory negligence); *Gibson v. Norfolk*

*Southern Corp.*, 878 F. Supp. 1455, 1462 (N.D. Ala. 1994) (stating that motorist's failure to obey

Alabama Code § 32-5A-150 entitled railroad to summary judgment), *aff'd*, 48 F.3d 536 (11th

Cir. 1995); *Borden v. CSX Transp., Inc.*, 843 F. Supp. 1410, 1422 (M.D. Ala. 1993) (finding that

motorist's contributory negligence was the sole proximate cause of grade crossing collision and

granting summary judgment in favor of railroad).

**B.      Assumption of the Risk.**

Defendants argue that, under Alabama law, a plaintiff's assumption of a risk which

proximately contributes to his injury completely bars him from recovering for any negligence of

the defendant.  *See Sprouse v. Belcher Oil Co.,* 577 So.2d 443, 444 (Ala. 1991) (discussing

assumption of the risk defense).  According to defendants, Watwood assumed the risk of his

death by ignoring the warning devices at the crossing and by proceeding into the path of the

oncoming train.  Therefore, defendants maintain, plaintiff's negligence claims against CSX and

Lattimore are completely barred.

13

To support this argument, defendants point to *Gibson v. Norfolk Southern Corp.*, 878 F. Supp. 1455 (N.D. Ala. 1994), *aff'd,* 48 F.3d 536 (11th Cir. 1995).  Similar to this case, in *Gibson*, a motorist was killed in a collision with a train at a grade crossing.  878 F. Supp. at 1458.  There, the administratrix of the motorist's estate sued the railroad and the manufacturer of the electronic flashing-light signal device guarding the crossing.  *Id.*  The plaintiff claimed that a malfunction in the signal device caused its lights to flash continuously and thereby gave the motorist a false impression of safety, as in the past the lights flashed when no train was approaching.  *Id.* at 1458-62.  However, the court in *Gibson* found that the only conclusion supported by the evidence was that the motorist ignored the flashing lights and bell warnings and proceeded into the path of the oncoming train.  *Id.* at 1461-62.  The court further held that, even if the plaintiff could demonstrate that there was a malfunction in the warning device that gave the decedent a false sense of security, the fact that the motorist entered the crossing without stopping and visually verifying that no train was coming still constituted an assumption of the risk that would bar the plaintiff's negligence claims.  *Id.* at 1462.

Defendants argue that, although this case does not involve active warning devices, the same principles are applicable here as in *Gibson*.  According to defendants, when the existence of a railroad crossing is clearly marked, when a train is plainly visible, and when its approach is made known by means of visible and auditory signals from the locomotive, a motorist assumes the risk of injury by proceeding into the path of the train.  With the railroad crossing here, defendants maintain, there were five signs or markers to give notice to a motorist.  Defendants point to photos of the crossing showing pavement marking symbols, a yellow advance warning sign, a stop sign at the siding, crossbucks, and another stop sign at the mainline track (Def. Exh.

14

5).[11]  Despite these warnings, defendants conclude, Watwood proceeded through the crossing and into the path of the train.

### C.      No Substantial Evidence of Negligence or Wantonness.

Defendants argue that plaintiff has not and cannot produce substantial evidence of negligence or wantonness.  However, defendants maintain, they have submitted affirmative evidence that they were neither negligent nor wanton in the operation of the train.  Defendants assert that the train's horn was sounding, its bell was ringing, its speed was more than ten miles below the speed limit, and its headlight was burning.  Defendants also note the Lattimore engaged the trains emergency brakes once it became evident that Watwood was not going to yield to the train.  According to defendants, this is substantial evidence that they were not negligent or wanton.  *See National R.R. Passenger Corp.,* 949 F. Supp. at 1562-63 (holding that railroad demonstrated it was not negligent or wanton by showing that its locomotive blew its horn, rung its bell, illuminated its headlight, and went into emergency braking); *Gibson*, 878 F. Supp. at 1463-65 (concluding that plaintiff failed to produce evidence of railroad's negligence or wantonness in grade crossing accident).

### D.      Improper Speed.

According to defendants, federal preemption also bars plaintiff's claims for negligence as to the train's speed.  In *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993), the United States Supreme Court found that the Federal Railroad Safety Act ("FRSA"), and the regulations promulgated thereto, preempt any state tort claim that a train was traveling at excessive speeds when approaching a grade crossing.  507 U.S. at 673-75.  Therefore, defendants assert, federal

---

[11] Also see Exhibit A.

15

regulations promulgated under the authority of the FRSA dictate the maximum allowable speeds for trains. 49 CFR § 213.9. Under 49 CFR § 213.9(a), the allowed speed varies depending upon the class of track at issue. Defendants maintain that the track at issue in this case is a Class Four track, which has a maximum speed of 60 miles per hour. (Spriggs Aff. ¶ 4). In *Easterwood*, the Court stated:

> On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also precluding additional state regulation of the sort that respondent seeks to impose on petitioner.

507 U.S. at 674. Defendants maintain that, prior to the collision involved here, the train was traveling at 48 miles per hour, 12 miles per hour below the speed limit. Therefore, defendants argue, plaintiff's claim of improper speed is preempted. *See Gibson,* 878 F. Supp at 1463 (holding that excessive speed claim was preempted in grade crossing collision case); *National R.R. Passenger Corp.*, 949 F. Supp. at 1561 (finding that § 213.9(a) preempted excessive speed claim in grade crossing collision case).

    **E.**    **Excessive Vegetation.**

    Defendants maintain that, in addition to the doctrines of contributory negligence and assumption of the risk, there are other problems with plaintiff's claim that vegetation was obscuring Watwood's view and that CSX should have cut it back. First, defendants argue there is no evidence that vegetation , or anything else, obstructed Watwood's view of the train. Defendants point to Lattimore and Dyer's testimony that they had a clear view of Watwood's

truck and to photographs of the crossing, which, according to defendants,  show that Watwood

had a clear view of the train.  Secondly, defendants assert that there is no cause of action in

Alabama against a railroad for permitting excessive vegetation to obstruct a motorist's view of an

oncoming train.  *See Louisville & N. R. Co. v. Garrett,* 378 So.2d 668, 675 (Ala. 1979) (stating

that "such obstructions are not actionable per se but only go to the commensurate degree of care

required of the railroad in operating its train through the crossing in light of the obstructions to

view"); *Alabama Great Southern R. Co. v. Johnston*, 199 So.2d 840, 843 (Ala. 1967) (stating,

"[w]e think that the mere neglect to cut down such trees, whether causeless or not, whether they

could be cut down with slight trouble and expense or not, is not . . . in itself actionable

negligence).

### F.      Malfunctioning Gates at Nearby Crossing.

According to defendants, plaintiff claims that the active traffic control devices at crossing

639-397G, the crossing immediately to the east of 639-400M, had a false activation.  A false

activation is an "activation of a highway-rail grade crossing warning system caused by a

condition that requires correction or repair of the grade crossing warning system."  49 CFR §

234.5.  Defendants assert that plaintiff claims that this false activation caused Watwood to travel

west to use crossing 639-400M and that it, therefore, was the proximate cause of his death.

Defendants argue that, even assuming there was a false activation of the gates and lights

at crossing 639-397G, it cannot, as a matter of law, be the proximate cause of Watwood's death.

According to defendants, Watwood still had both a statutory and a common law duty to stop at

crossing 639-400M and wait until the train had passed.  Defendants maintain that Watwood's

failure to stop, look, listen, and yield was the proximate cause of his death.

The case of *Gibson v. Norfolk Southern Corp.*, defendants contend, is relevant here.  In *Gibson*, the plaintiff alleged that the signal lights frequently malfunctioned, giving warnings of a train when in fact no train was approaching.  878 F. Supp. at 1659.  According to the plaintiff in *Gibson*, this malfunction lulled her decedent into a false sense of security, and he proceeded through the crossing into the path of the train.  *Id.* at 1458-62.  However, the *Gibson* court found that the motorist still assumed the risk of injury by proceeding into the crossing without stopping and visually verifying that no train was coming.  *Id.* at 1462.  Similarly in the present case, defendants assert, Watwood assumed the risk of his injury by proceeding through crossing 639-400M without yielding to CSX's train.

Defendants maintain that, even assuming there was a false activation, plaintiff has offered no evidence that CSX knew about it.  According to defendants, even if there was a false activation and CSX knew of it and its train crew did not slow to a speed of 15 miles per hour, as required by federal law,[12] such failure to act still would not have been the proximate cause of the accident.  Defendants point out that as soon as the train passed crossing 639-397G, it would have been permitted to resume normal speed under 49 CFR § 234.107.  More importantly, defendants argue, any negligence of CSX in failing to slow to 15 miles per hour occurred prior to the negligence of Watwood in failing to yield to the train.  Finally, defendants conclude, plaintiff has offered no evidence of a false activation.  Defendants point out that the fact that the gates were down and the lights were flashing is not, by itself, evidence of a false activation.  Instead, defendants assert, such warnings may have signaled that there was an approaching train.

_____

[12] *See* 49 CFR § 234.107 (detailing railroad's responsibilities upon credible report of a false activation).

II.    <u>Plaintiff's Response.</u>

Plaintiff disputes defendants' argument that Watwood was contributorily negligent as a matter of law.  Plaintiff argues that, to be guilty of contributory negligence as a matter of law, a court must find from the evidence that the acts of the plaintiff were the functional equivalent of assumption of the risk.  *See Aplin v. Tew,* 839 So.2d 635, 638 (Ala. 2002) (stating, "[t]o establish contributory negligence as a matter of law, a defendant must show that the plaintiff put himself in danger's way and that the plaintiff had a conscious appreciation of the danger at the moment the incident causing the injury occurred").  Therefore, plaintiff asserts, the defendants in this case would have to prove that Watwood appreciated the danger of his situation and drove into the path of the train anyway.  *See Empiregas, Inc., of Belle Mina v. Suggs,* 567 So.2d 271, 273 (Ala. 1990) (stating, "[t]hat a party who has been injured says he would act differently next time, so as to prevent the injuries, does not conclusively establish his negligence in not having the foresight to prevent the injuries on the first occasion and certainly does not show 'a conscious appreciation [of the danger] at the moment the incident occurred'" (citations omitted)).  According to plaintiff, the testimony of James and Deweese demonstrates that Watwood did not appreciate the danger of his situation or even perceive the presence of the locomotive at the moment of his accident. Therefore, plaintiff maintains, the evidence precludes summary judgment based on contributory negligence or assumption of the risk as a matter of law.

Plaintiff notes that, under Alabama law, the issues of contributory negligence and assumption of the risk are normally ones to be decided by the trier of fact.  *Central Alabama Elec. Co-op. v. Tapley*, 546 So.2d 371, 381 (Ala. 1989).  In *Burlington Northern R. Co. v. Whitt,* the Alabama Supreme Court stated, "[t]o prove contributory negligence, a defendant must show

that the plaintiff knew of the condition, appreciated the danger of the circumstances at the moment the incident occurred, and placed himself in danger's way." 575 So.2d 1011, 1021 (Ala. 1990). Plaintiff disputes defendants' contention that Watwood did not stop, look and listen before the accident. Plaintiff points to James' testimony that one of the trainmen involved in the accident stated that Watwood had stopped and eased forward a few times before proceeding into the crossing.[13] In further support of her position, plaintiff draws attention to photographs of crossing 639-400M, which she alleges, show that the approach to the crossing comes in at an angle. (Pl. Exh. B). A reasonable jury, according to plaintiff, could conclude that a man operating a logging truck would have reduced visibility at the crossing because of the angle of approach to the crossing and the logs he was transporting.

Additionally, plaintiff contends, it is well settled law that the defense of contributory negligence is not a bar to a plaintiff's recovery in a case where the plaintiff has no reasonable alternative course of conduct that would avert the harm. *See Littleton v. W. U. Tel. Co.,* 442 F.2d 1169, 1171-72 (10th Cir. 1971) (stating that plaintiff did not voluntarily incur risk when defendant's conduct left plaintiff with no reasonable alternative); *O'Rielly Motor Co. v. Rich,* 411 P.2d 194, 197 (Ariz. App. 1966) (stating, "[i]n order for the acceptance of the risk to be deemed voluntary, a defendant by his tortious conduct cannot force upon a plaintiff a choice of courses which does not offer a reasonable alternative to encountering the risk"). In this case, plaintiff argues, Watwood used an alternative means of crossing CSX's tracks in response to CSX's negligence in maintaining crossing 639-397G. Plaintiff points to James' testimony that the

---

[13] See prior discussion of the court suggesting that this statement is inadmissible under *Wilkinson v. Carnival Cruise Lines, Inc.,* 920 F.2d 1560 (11th Cir. 1991).

warning devices at crossing 639-397G had malfunctioned at least three times a week for the two

and a half months preceding the accident.  Additionally, plaintiff draws attention to Deweese's

testimony that, on numerous occasions, the traffic control devices at crossing 639-397G had

malfunctioned.  Deweese stated that on one such occasion, after waiting approximately 30

minutes, a CSX employee had manually lifted the gates to allow him to cross the railroad tracks.

As proof that CSX knew of the problems at crossing 639-397G, plaintiff points to Deweese's

testimony that he had seen workers at the crossing performing repairs on the traffic control

signals.  Plaintiff contends that a reasonable juror could conclude that defendant's negligent

maintenance of the active control devices at crossing 639-397G left Watwood with no reasonable

alternative means of crossing CSX's tracks without using crossing 639-400M.  Therefore,

plaintiff concludes, a reasonable juror could determine that the defenses of contributory

negligence or assumption of the risk are inapplicable in this case.

       Plaintiff further contests defendants arguments that there is no evidence of negligence on

the part of CSX.  Plaintiff argues that CSX was negligent in its maintenance of the warning

devices at crossing 639-397G.  This negligence, plaintiff asserts, caused Watwood to use

crossing 639-400M, which was not protective by active traffic control devices and which

provided Watwood with a very poor view of oncoming trains.

       Additionally, plaintiff argues, CSX's train crew was negligent in its operation of the train.

The Code of Alabama states:

> The engineer or other person operating a locomotive on any railroad must blow
> the horn or whistle or ring the bell:
>
> (1) At least one fourth of a mile before reaching any public road crossing or any
> regular station or stopping place on such railroad and continue with such signal at

short intervals, until such crossing or such station or stopping place has been passed;

(2) Immediately before and at the time of leaving a station or stopping place and also immediately before entering any curve crossed by a public road, not marked in accordance with Section 37-2-80, where he cannot see at least one quarter of a mile ahead, and must approach and pass such unmarked crossing at such speed as to prevent an accident in the event of an obstruction at the crossing; and

(3) At short intervals, on entering into, or while moving within or passing through any village, town or city.

He must also, on perceiving any obstruction on the track, use all means within power, known to skillful engineers, such as applying brakes, in order to stop the train.

Ala. Code § 37-2-81 (1975).  Plaintiff points out that Lattimore and Dyer testified that they started to sound the train's horn slightly over one quarter of a mile from the crossing where the accident occurred.  Plaintiff asserts that defendants' evidentiary submissions show that the train went into emergency breaking 3,038 feet before coming to a complete stop, and that the train began sounding its horn 4,443 feet prior to coming to a complete stop.  According to plaintiff, the whistle began sounding slightly more than 1,320 feet from the leading edge of the crossing and the train went into emergency breaking slightly more than 115 feet before impact.

Plaintiff argues that a reasonable juror, understanding that the emergency brakes are the most reliable way of stopping a train before an impact, could find that the engineer was negligent in not applying the emergency brakes sooner.  Plaintiff points to the evidence that Watwood was pulling up and stopping repeatedly before pulling into the crossing to show that Lattimore should have seen Watwood and applied the emergency brakes before getting within 115 feet of the crossing.  Plaintiff also asserts that the train was operating at 48 miles per hour at the time of impact and, therefore, must have gone into emergency braking less than two seconds before the

22

collision.[14]  According to plaintiff, a reasonable juror could conclude that going into emergency

braking less than two seconds before impact did not represent the best efforts by a skillful

engineer to avoid an accident, as required by Alabama law.

Plaintiff further argues that defendants should have recognized the continuing defects in

the active traffic control devices at crossing 639-397G and placed the appropriate speed

restrictions on that section of track as mandated by Federal law.  Had they done so, plaintiff

argues, the train would have been operating at 15 miles per hour less than a mile from where the

accident occurred.[15]  A reasonable juror, plaintiff maintains, could conclude that had the

defendants complied with applicable Federal law and had the engineer exercised better judgment

in activating the emergency breaking system, the accident could have been avoided.

## III.   Defendant's Reply.

_____According to defendants, although the Complaint asserts multiple theories of negligence,

plaintiff's brief reduced them to the following two: (1) that Lattimore should have made an

emergency application of the brakes earlier than he did; and (2) that CSX negligently maintained

the crossing immediately to the east of the one involved in the accident and that this negligence

caused a false activation.  However, defendants maintain, plaintiff has failed to offer substantial

evidence to support these two theories or to overcome defendants' assertions that Watwood was

contributorily negligent and assumed the risk of the accident.

### A.   Contributory Negligence.

---

[14] Plaintiff does not cite to the record for this proposition.

[15] In support of this contention, plaintiff simply points to the Federal law discussed in defendants' brief, but does not indicate which specific federal law she is referencing.

Defendants reiterate their arguments that summary judgment is appropriate here because Watwood was contributorily negligent in violating Alabama Code § 32-5A-150 and in violating his common law duties as a motorist approaching a grade crossing. Defendants dispute plaintiff's assertion that Watwood was not negligent because he stopped, looked and listened before crossing in the train's path. Defendants argue that Watwood's purported repeated easing and stopping in front of the crossing[16] is not evidence that he stopped at the crossing, looked for a train, and listened for its approach. However, defendants argue, even if Watwood did do these things, he was still contributorily negligent.

According to defendants, a motorist who stops, looks and listens has not fulfilled all the statutory duties set forth in § 32-5A-150. Defendants argue that such a motorist must also refrain from proceeding through the crossing when an approaching train is blowing its horn or when a train is plainly visible and in hazardous proximity to the crossing. Defendants contend that Watwood clearly violated this requirement of the statute. Defendants highlight the evidence that, prior to the accident, Lattimore was blowing the locomotive's horn, the train's headlight was burning, its ditch lights were flashing, and both Lattimore and Dyer could plainly see the truck.

Moreover, defendants assert, plaintiff's claim that Watwood stopped, looked and listened is irrelevant, as Watwood was still under a continuing duty to be on the lookout for, and to avoid, oncoming trains:

> [O]ne who is about to cross a railroad track must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. The law thus imposes a continuing duty to see that the

---

[16] See supra for defendants' objections to this evidence.

> way is clear before attempting to cross.  Where obstructions interfere with his
> view of the track, it is all the more his duty to stop, look, and listen at a point
> where he can best see and hear, and, seeing or hearing, avoid an onrushing train.

*Atlantic Coast Line R. Co. v. Griffith*, 113 So.2d 788, 792 (Ala. App. 1959) (internal quotation

marks and citations omitted).  Defendants argue that plaintiff has failed to offer any evidence that

Watwood fulfilled this continuing duty.  Further, defendants contend, the fact that Watwood

pulled out in front of a plainly visible and audible train demonstrates that he violated this duty.

*See National R.R. Passenger Corp. v. H & P, Inc.,* 949 F. Supp. 1556, 1563 (M.D. Ala. 1996)

(stating, "plaintiff's testimony that he stopped, looked, and listened, in the face of the

circumstances that if he had stopped, looked, and listened he could have either heard or seen the

train which was moving toward the crossing and near thereto when the plaintiff drove his

automobile on the railroad track, does not constitute a conflict in the evidence").

Defendants next dispute plaintiff's argument that Watwood had no reasonable alternative

to avoid the collision.  Defendants argue that it is absurd to think that, because Watwood could

not cross at crossing 639-397G, he had no choice but to pull into the path of the train at crossing

639-400M.  Defendants maintain that Watwood's alternative choice was to wait until CSX's

train had passed through crossing 639-400M before proceeding.

According to defendants, plaintiff suggests that the law of contributory negligence

requires an appreciation of the danger, and that Watwood did not subjectively appreciate the

approach of CSX's train.  However, defendants argue, the appreciation required by the law is

objective not subjective:

> Contributory negligence is not predicated solely on knowledge of the danger, and
> the certainty of injury to follow. If such were the rule, contributory negligence
> would be a synonym for willful suicide or self-injury. If plaintiff had knowledge

> of facts sufficient to warn a man of ordinary sense and prudence of the danger to
> be encountered, and of the natural and probable consequences of his own conduct
> in the premises, then he was guilty of negligence if he failed to exercise ordinary
> care to discover and avoid the danger and the injury.

*Gulledge v. Brown & Root, Inc*., 598 So.2d 1325, 1327 (Ala. 1992) (citations and punctuation

omitted) (original emphasis omitted).  Additionally, defendants assert, in the context of railroad-

grade crossing accidents, when a motorist pulls in front of a plainly visible and audible train,

appreciation of the danger is imputed as a matter of law.  *See Gibson*, 878 F. Supp. at 1460-62

(imputing awareness and appreciation of danger of oncoming train to deceased motorist).

### B.      Assumption of the Risk.

According to defendants, plaintiff offers no direct argument or evidence to refute the

defendants claims that Watwood assumed the risk of the accident.  Defendants argue that *Gibson*

*v. Norfolk Southern Corp.,* 878 F. Supp. 1455 (N.D. Ala. 1994), instructs that Watwood must be

held to have assumed the risk of a collision and his death as a matter of law.  Defendants point to

the evidence that Watwood passed five signs or markers advising of the existence of the crossing,

that Watwood was traveling slow enough such that the engineer and conductor thought he would

stop, and that the train was blowing its horn and burning its headlight.

### C.      No Substantial Evidence of Negligence or Wantonness.

Defendants reassert their argument that they were not negligent.

#### 1.      Failure to Timely Brake.

According to the defendants, plaintiff first claims that defendant Lattimore was negligent

in that he failed to make an emergency application of the brakes in a timely manner.  However,

defendants maintain, plaintiff has failed to offer substantial evidence of such negligence.

Defendants address plaintiff's argument that the engineer did not apply the train's brakes until it was 115 feet, or two seconds, from the crossing. Defendants contend that this argument is based entirely upon the opinion of plaintiff as she interprets a printout of the data downloaded from the event recorder. Defendants argue that interpretation of this downloaded data, and the formulation of opinions based on that interpretation, requires specialized knowledge that is within the exclusive province of an appropriate expert. Defendants point out that the printout contains no direct information about when the collision occurred. By itself, defendants assert, the printout cannot provide a basis upon which to form an opinion as to how far before the crossing the train went into emergency braking.

Additionally, defendants maintain that, even assuming the emergency brakes were not applied until 115 feet before the crossing, plaintiff has not produced any evidence to show that they should have been applied sooner. Such evidence, according to defendants, would also require expert testimony, as such information is not within the understanding or knowledge of a layperson. *See, e.g., In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Alabama, on September 22, 1993,* 188 F. Supp.2d 1341, 1346-47 (S.D. Ala. 1999) (stating that claims concerning the speed of a train present technical issues beyond the common experience and understanding of a jury, and that plaintiffs' claims failed because they presented no expert testimony on the subject). Defendants state that plaintiff has not submitted any evidence which a jury could consider in deciding when the engineer should have applied the brakes. However, defendants argue, they have presented evidence that the engineer expected the truck to stop and that he applied the emergency brakes as soon as it became evident that the truck would not stop. Defendants point to the following testimony of Lattimore:

27

> I expected the logging truck to stop as it was going at a speed at which it could stop at the crossing. It did not; instead, it proceeded across the crossing. When I observed the truck pull into the path of the train, I placed the train into emergency application of the brakes. The locomotive collided with the truck.
>
> There was no action I could have taken to avoid this collision, and I did everything I could do to avoid the collision once I realized the truck was not going to stop for the train.

(Lattimore Aff. ¶¶ 5-6). Defendants further argue that this testimony refutes plaintiff's claim that

Lattimore did not comply with Alabama Code § 37-2-81, as it shows that Lattimore applied the

brakes as soon as he observed the truck pulling into the path of the train.

### 2. Negligent Maintenance of Crossing 639-397G.

According to the defendants, plaintiff also claims that CSX was negligent in its

maintenance of the active control devices at crossing 639-397G and that this led to a false

activation of those devices on the day of the accident, causing Watwood to use crossing 639-

400M. Defendants maintain that there is no evidence of a false activation. Regarding Deweese's

testimony that he was blocked by such false activations on various occasions, defendants argue

that Deweese's testimony does not indicate when or at which crossing such events occurred.

Defendants contend that these vaguely described events are not evidence that the gates at

crossing 639-397G were falsely activated on July 5, 2003. Similarly, defendants argue that

James' purported testimony concerning such false activations at other times is also no evidence

that a false activation occurred on the day of the accident. According to defendants, to prove a

false activation on July 5, 2003, plaintiff would have to present expert testimony explaining that

the only thing that could cause gates to activate was something that required correction or repair.

Additionally, defendants assert, even if the affidavits of Deweese and James were

somehow considered substantial evidence of a false activation on the day of the accident, there is no evidence that such an activation was caused by negligent maintenance of the traffic control system.  Again, defendants maintain, an expert would be needed to testify on the possible causes of a false activation, on the type of maintenance that is required, and on why a failure to maintain caused a false activation on July 5.  Furthermore, according to defendants, plaintiff has failed to offer substantial evidence that CSX knew of any such false activation.

Finally, defendants argue that, even if plaintiff could prove all the other elements of negligence, she cannot prove that defendants' negligence was the proximate cause of Watwood's death.  According to defendants, Watwood's own actions were the sole proximate cause of his death.  Defendants contend that the fact that a motorist is forced to use another crossing because one is impassable does not obviate or lessen his duty to stop, look, and listen for or yield to any oncoming trains.  Defendants argue that these duties were imposed upon Watwood subsequent to his decision to find another crossing.  These intervening duties, defendants assert, eliminate any supposed false activation at 639-397G as the proximate cause of his death.  *See Ayoub v. Nat'l R.R. Passenger Corp.*, 76 F.3d 794, 796 (6th Cir. 1996) (holding that motorist's negligence was the sole proximate cause of his death in grade crossing accident notwithstanding the fact that signals at the crossing had previously falsely activated).

## CONCLUSIONS OF THE COURT

The court starts with the conclusion that any evidence related to the crossing at 639-397G is irrelevant.  This court was initially reminded of the classic law school case of *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (N.Y. 1928).  Judge Cardozo's opinion was premised on lack of duty.  The following language in *Palsgraf* may well have application here:

29

> [T]he orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty.

248 N.Y. at 343.

_ _ _ _ _

> The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation

*Id.* at 344.

_ _ _ _ _

> Negligence, like risk, is thus a term of relation. Negligence in the abstract, apart from things related, is surely not a tort, if indeed it is understandable at all.

*Id.* at 345.

Whether viewed as an issue of duty, scope of duty, foreseeability, intervening act, superseding cause, or proximate cause, what did or did not occur at crossing 639-397 is irrelevant to what occurred at the crossing where the accident happened.

This court's only reservation as to the significance of the situation at the first crossing comes from *Louisville & N.R. Co. v. Maddox*, 236 Ala. 594, 183 So. 849 (Ala. 1938), a case not cited by either party.  That case, however, is distinguishable on a number of points.  First the defendants did not affirmatively direct the plaintiff here to the other crossing.  In *Maddox*, the elderly passenger was directed to the wrong train by the defendant's employee.  The complaint in *Maddox* stated:

> One Duncan, the individual defendant, then in the service and employment of the corporate defendant, as conductor in charge of said regular passenger train, designated as train 99, was then and there intrusted and charged by defendant corporation with the duty of seeing that only those who were equipped with a ticket entitling them to transportation thereon boarded said train 99, and it then and there became the duty of defendants to intestate to see that intestate did not

30

board said train 99, equipped only with a ticket entitling her to transportation on
said excursion train.

183 So. at 850.

Second, *Maddox* involved the highest duty of care which a railroad owes its passengers

under Alabama law.  The court stated:

> Having assumed the position of a common carrier for hire of passengers, such
> common carrier is not an insurer of the safety and comfort of its passengers, its
> duties being to exercise the highest degree of care, skill, and diligence known to
> competent operators of railroad passenger trains to protect their passengers while
> boarding the train, in transit and alighting therefrom.

*Id.* at 851.

The court further stated:

> The question then presented by the plea and the evidence is, Was the accident and
> injury to intestate reasonably to be apprehended in view of all the circumstances
> affecting her as a traveler, when her advanced age of eighty-one years and the fact
> that she was unattended in making the change of trains in Montgomery, required
> or made necessary by the acts of several of defendant's agents, are considered?

*Id.* at 852.

– – – – –

> Under the evidence in this case, it was open for the jury to find that through the
> negligence of the defendant carrier – that is, a violation of its continuing duty to
> safely carry the plaintiff's intestate and set her down at her contract-destination –
> she was brought into the zone of danger by being put off at Montgomery without
> safeguards to put her on the train on which she was entitled to be transported, and,
> as a proximate cause, she met her injury and death. There was no intervening
> wrongful act of a third person to break the natural sequence of the violation of the
> stated duty by the defendant. *Thompson v. Louisville & N. R. R. Co.*, 91 Ala. 496,
> 501, 8 So. 406, 11 L.R.A. 146; *Cook v. Continental Ins. Co.*, 220 Ala. 162, 168,
> 124 So. 239, 65 A.L.R. 921.

*Id.* at 854 (emphasis added).

This court further notes that it is not clear from the *Maddox* opinion whether the defense

of contributory negligence was raised, or, if so, whether the evidence was sufficient.  The court

referred to the plaintiff's "innocent and necessary act."  *Id* at 854.

Contrary to the situation in *Maddox*, the intestate here had the option of awaiting help at

the first crossing.  He certainly was not directed to the second crossing by the defendants.  He

was not misled by an agent of the defendants.  The cited *Gibson* case is more apt here.  Also

more akin to this case is *Malcomb v. Louisville & N.R. Co.*, 155 Ala. 337, 46 So. 768 (Ala.

1908).  The court in *Malcomb* explained the distinction as follows:

> The question, then, is: Did the act of the defendant in failing to stop its train
> produce the injuries complained of? Did the injuries result directly from such act?
> We have a class of cases where the carrier has been held liable to the passenger
> for injuries to health, etc., incident to walking back to a station after having been
> carried beyond it, or the point of destination (*A. G. S. R. R. Co. v. Sellers*, 93 Ala.
> 9, 9 South. 875, 30 Am. St. Rep. 17; *L. & N. R. R. Co. v. Dancy*, 97 Ala. 338, 11
> South. 796); but the theory worked out in those cases is that the carrier, by its
> wrongful act, placed the plaintiffs in a position where it was necessary for them to
> act, to avoid the consequences of the wrongful act of the carrier, and, acting with
> ordinary prudence and care, to the end of extricating themselves from the
> difficulty in which they had been placed, they sustained the injury. The injury was,
> therefore, traceable directly to the carrier's negligence as its cause, and as its
> proximate cause. Passengers wrongfully put off short of, or beyond, the
> destination stipulated for, would be most likely to walk to the point to which they
> desired to go, if no other convenient way was presented or was open to them; and
> it is not straining any legal principle to hold that injuries received in consequence
> of the walk are recoverable damages.
>
> But we find no trouble in distinguishing the case in judgment from that class of
> cases. Here it is made to appear that the carrier had nothing to do with placing the
> plaintiff in the position in which he found himself after the failure of the trains to
> stop. He was in the same position he occupied before he purchased his ticket, and
> we cannot perceive that injuries resulting from the walk by the plaintiff to
> Evergreen were a natural sequence of the failure of the agents of the carrier to stop
> the trains at Castleberry. As was said in *I., B. & W. Ry. Co. v. Birney*, 71 Ill. 391, a
> case strikingly similar to the case in hand: "That he should be delayed in reaching
> that point was a natural consequence, as there was no other known means by
> which the space could be overcome in so short a time as by a train of cars; but that
> the appellant should walk through the extreme cold to that point, and thus injure

his health, was by no means a necessary result." As was further said in that case, had he procured a carriage and horses to make the trip, the company would no doubt have been liable for reasonable compensation for its use and for a driver, or had he waited the next train, and gone on it, he would have been entitled to nominal damages, at least, for necessary expenses incurred whilst waiting the arrival of the train, and loss, if any, by failure to meet the engagement. *Gulf, etc., R. R. Co. v. Cleveland* (Tex. Civ. App.) 33 S. W. 687; *Francis v. Transfer Co.*, 5 Mo. App. 7; *Evans v. St. L., etc., Co.*, 11 Mo. App. 463. In the light of the foregoing principles, and applying them to the facts of this case, the court is of the opinion that plaintiff was awarded the only damages he was entitled to recover in the action, and, of consequence, that there is no reversible error shown by the record.

46 So. at 769.

If plaintiff's argument as to the first crossing were accepted, the following scenario could arise. "A" negligently causes an accident at the intersection of 1st Avenue and 2nd Street. The accident creates an obstruction which causes "B" to have to go to 1st Avenue and 3rd Street where he has an accident. It defies common sense to say that "A" is liable for the second accident based purely on his having caused the obstruction at the first intersection. This court concludes that what happened at the first railroad crossing is irrelevant.

This court will not reach the issue of whether there is sufficient evidence to establish negligence on the part of the defendants. It is questionable at best as to any of the claims listed in footnote 9 above.

The contributory negligence of the intestate, however, would appear to be obvious. As indicated by the photographs, the crossing was clearly marked and the approaching train was visible for a substantial distance. There is no evidence of the "special circumstances" referred to in *Ridgeway*. The cited Alabama cases, the Alabama statute and the *Gibson* case all establish that the intestate was clearly contributorily negligent.

33

The issue is not only whether the intestate clearly saw the train, but whether, under the circumstances, he should have seen it and ceased crossing until the train passed.  Under *Atlantic Coast Line R. Co. v. Griffith*, 113 So.2d 788, 792 (Ala. App. 1959), he had a continuing duty to observe and stop when called for.

The defendants' Motion for Summary Judgement will be granted.

This 12th of January, 2005.

_____
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**